**In re HUNT ENERGY CO., INC., Debtor and Debtor-In-Possession.**

**HUNT ENERGY CO., INC., Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Bankruptcy No. B84–00954.
Adv. No. B85–0076.**

United States Bankruptcy Court,
N.D. Ohio, E.D.

April 2, 1985.

Kevin T. Duffy, Parks, Eisele & Bates, Cleveland, Ohio, for debtor and debtor-in-possession.

Brian A. Bash, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for Unsecured Creditors' Committee.

John Silas Hopkins, III, Joseph Patchan, Susan B. Collins, Lenza McElrath, Jr., Constance M. Iskin, Harold Mead Hickok and Thomas R. Lucchesi, Baker & Hostetler, Cleveland, Ohio, for Seattle-First Nat. Bank, et al.

Frederick S. Coombs, III, Harrington, Huxley & Smith, Youngstown, Ohio, for Mahoning Nat. Bank.

Richard G. Hardy and Stephen A. Markus, Ulmer, Berne, Laronge, Glickman & Curtis, Cleveland, Ohio, for Russell Spitz.

Robert A. Westbrooks, Cleveland, Ohio, for East Ohio Gas Co.

James W. Ehrman, Manchester, Bennett, Powers & Ullman Co., L.P.A., Cleveland, Ohio, for Youngstown Indus. Corp. and LTV Steel Co., Inc.

Alan R. Lepene and Craig R. Martahus, Thompson, Hine & Flory, Cleveland, Ohio, for Finial Inv. Corp., Gefinor Inv. Corp. and B.I.D. Finance, B.V.

Lawrence E. Oscar, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for Bank of New England, N.A.

David R. Mayo, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Mechanic Lien Holders.

Larry G. Cecil, Fitch, Kendall, Cecil, Kendall & Robinson, Salem, Ohio, for Firestone Elec. Co.

Donald P. Herriott, Newman, Olson & Kerr, Youngstown, Ohio, for Schloeman Siemag A.G., and SMS Inc.

Michael D. Schenker, Kelley, McCann & Livingstone, Cleveland, Ohio, for Harbison-Walker Refractories.

Raymond T. Bules, Day, Ketterer, Raley, Wright & Rybolt, Canton, Ohio, for General Refractories Co.

Harry W. Greenfield, Javitch & Eisen Co., L.P.A., Cleveland, Ohio, for Combustion Engineering and Firestone-Yobe.

James R. King, Akron, Ohio, for Ohio Edison Co.

Marilyn Shea-Stonum, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for North Star Steel Co.

## MEMORANDUM OF OPINION

JOHN F. RAY, Jr., Bankruptcy Judge.

This matter came on for hearing on the amended complaint of Hunt Energy Co., Inc. ("Hunt") to sell assets comprising the Hunt mini-mill, Hunt's motion for order authorizing and directing Hunt to sell mini-mill assets to North Star Steel, motion of Russell W. Spitz to compel receiver to accept bid of Youngstown Industrial Corporation ("Spitz Motion"), the evidence, briefs of counsel and oral argument of counsel.

The Court makes the following findings of fact, conclusions of law and orders:

### Findings of Fact

On February 10, 1984, Hunt filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, (11 U.S.C. §§ 1101 et seq.) (Hunt Docket Entry 1) Pursuant to sections 1107 and 1108 of the Bankruptcy Code (11 U.S.C. §§ 1107, 1108), Hunt has retained possession of its assets, and it is authorized to continue the operation and management of its business.

At the time of filing this case, Hunt owned and operated profitably its Valve Division in Salem, Ohio, and its Waeco Division in Salt Lake City, Utah. (Kapusta, 6 Tr. 21–22) Hunt also owned assets associated with its Wireline Division in Parkersburg, West Virginia, which ceased operations shortly after the filing of this petition (Kapusta, 6 Tr. 21–22, 27), and manufacturing equipment formerly used in its Equipment Division in Canfield, Ohio (Kapusta, 6 Tr. 21, 26). In addition, Hunt owned a mini-mill in Youngstown, Ohio, which was designed to process scrap steel into seamless tube, but which had been out of operation since November 22, 1983. (Kapusta, 6 Tr. 13–14, 15 [transcribed incorrectly as June 22], 47–48) This adversary proceeding involves the mini-mill.

In November, 1984, Hunt sold the Valve Division in Salem, Ohio, the Waeco Division in Salt Lake City, Utah, and certain of the assets associated with the Equipment Division in Canfield, Ohio, to Irving Kaplan. (Kapusta, 6 Tr. 22) After the sale of the Valve Division, Hunt no longer had any assets which generated regular income. (Kapusta, 6 Tr. 21)

On February 8, 1985, Hunt filed a "complaint to sell assets comprising Hunt's mini-mill," which named 104 defendants and initiated this adversary proceeding. (Hunt Docket Entry 330) On February 15, 1985, Hunt filed an "amended complaint to sell assets comprising Hunt's mini-mill" ("Amended Complaint"). (Hunt Adversary Docket Entry 114) The Amended Complaint brought the total of named defendants to 147, but did not otherwise change the complaint. (Amended Complaint, Hunt Adversary Docket Entry 114)

The assets which are the subject of the Amended Complaint consist of a pipe mill located in Youngstown, Ohio, related personal property, both tangible and intangible, and 17.58 acres of real property upon which the pipe mill is located (the "Hole"). (Amended Complaint, Hunt Adversary Docket Entry 114; Racek, 2 Tr. 118) Also involved in this proceeding is a surrounding parcel of land containing 151.44 acres with buildings (the "Donut") (Racek, 2 Tr. 117–118), which has been used in conjunction with the operation of the pipe mill (Kapusta, 6 Tr. 25–26).

On March 6, 1985, Hunt filed a "motion for order authorizing and directing Hunt to sell mini-mill assets to North Star Steel" ("Motion To Sell To North Star"). (Hunt Adversary Docket Entry 305) In its Motion To Sell To North Star, Hunt sought authority to sell all of its personal property associated with its mini-mill, the 17.58 acres upon which the mini-mill sits and the 151.44 acres of land surrounding the mini-mill.

After negotiations between Hunt and North Star Steel Company ("North Star"), Hunt filed an agreement between Hunt and North Star (the "Purchase Agreement") (Hunt Ex. 8, Hunt Adversary Docket Entry

363), containing the following material terms:

a. North Star will purchase from Hunt and Alex Mekedis, Receiver, Hunt's mini-mill assets including 169.02 acres of land located in Youngstown, Ohio, and Girard, Ohio, and used in the operation of Hunt's mini-mill. (Section 1)

b. North Star will pay $22,500,000 in cash (the "Purchase Price") for the mini-mill, the 17.58 acres upon which it sits, and 151.44 acres of land with buildings surrounding it. (Section 4) North Star may elect to have a portion of the Purchase Price not to exceed $2,250,000 retained by this Court or its designee for a period of up to nine months from the closing date to satisfy any unknown claims against the mini-mill assets which are not discharged by the Complaint. (Section 11.7)

c. The Purchase price will be paid to Alex Mekedis, in his capacities as Hunt's fiscal agent and as receiver in foreclosure of the Donut, until further order of this Court. (Section 11.5[b])

d. North Star agrees to take the property subject to certain tax benefit transfer leases with Northern States Power Company within the meaning of Section 5c.168(f)(8)–2(a)(6) of the Regulations under the Internal Revenue Code and covenants to take certain other actions with respect to the tax benefit transfer. (Section 3)

e. All of the assets must be conveyed to North Star free and clear of all liens, claims, charges, security interests, and other such encumbrances, exclusive of any existing easements and other land use restrictions. (Section 1.3)

f. North Star will assume no obligations, liabilities, or indebtedness of Hunt, unless otherwise specifically identified in the Purchase Agreement. (Section 3.1)

g. Hunt is obligated to secure an order from this Court by March 22, 1985, approving the Purchase Agreement, ordering the sale to North Star, and authorizing the execution, delivery, and performance of the Purchase Agreement;

and, in the event such an order is not entered by March 22, North Star has the right to terminate its agreement with Hunt. (Section 5)

h. Hunt and North Star must fully comply with the requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976. (Section 8)

i. North Star must reach satisfactory agreements with East Ohio Gas Company and Ohio Edison Company for the provision of utility services to the mini-mill and with LTV Steel Company for ingress and egress to and from the mini-mill. (Section 9.1[k])

j. North Star must secure the establishment of Enterprise Zones as defined in Ohio Revised Code §§ 5709.61–66 from the cities of Youngstown and Girard, Ohio, and from the County of Trumbull, Ohio. (Section 9.1[i])

k. North Star must receive a title insurance policy in the amount of $2,500,-000, half the cost of the premium therefor to be paid by Hunt. (Sections 6.1(f), 9(m), 11.4)

l. North Star must enter into arrangements with the Ohio Department of Development ("DOD") under which DOD will accept title to the raw land to be acquired by North Star. (Section 9[n])

m. The shareholders and/or the trustees of a voting trust which holds the stock of Hunt and the directors of Hunt must approve this transaction and authorize the execution, delivery, and performance of the Purchase Agreement. (Section 11.2[b])

n. This Court must find that various of the conditions to the Purchase Agreement have been fulfilled. (Section 9.1[p])

The Hunt pipe mill property was originally an integrated steel mill in which raw materials were processed into finished steel products. (Chekos, 3 Tr. 23; Layout Drawing, Bank Group Ex. 2) The principal functional components of the steel mill were a coke-making plant, blast furnace facilities, an open hearth furnace building, a blooming mill and a plate mill in what is now

called the west plant building. (Chekos, 3 Tr. 23–24; Kapusta, 6 Tr. 25) Coal was made into coke in the coke plant; the coke and iron ore were melted into iron in the blast furnaces; the iron was made into steel in open hearth furnaces in the open hearth building; and the steel was rough-processed in the blooming mill and finished in the plate mill. (Chekos, 3 Tr. 23–24; Kapusta, 6 Tr. 25)

Unlike the former steel mill, the Hunt mini-mill does not make steel from raw materials; it processes scrap steel into steel tube or pipe and is more properly referred to as a pipe mill. (Chekos, 3 Tr. 63) At this time the processing machinery for the pipe mill is all contained in the open hearth building. (Chekos, 3 Tr. 29) The open hearth building has undergone major renovation and excavation so as to adapt it for use in the production of seamless steel tube. (Chekos, 3 Tr. 33) This renovation and excavation involved the removal of the open hearth furnaces and the entire charging floor of the building. (Chekos, 3 Tr. 33; Photograph, Bank Group Ex. 6) Prior to the process of excavation and during the renovation, all existing machinery and equipment were removed from the building, except for the bridge cranes and the bag houses which are part of the pipe mill's pollution control system. (Chekos, 3 Tr. 35)

The building containing the present pipe mill operation is located on the Hole and was originally constructed as an open hearth furnace building. (Chekos, 3 Tr. 29) The building is a one-story, high-bay, heavy steel-frame structure with metal skin exterior and metal roof decking. (Racek, 2 Tr. 115) The building is in fair condition. (Racek, 2 Tr. 115) The building is divided into six contiguous bays totaling 311,600 square feet of ground floor area. (Chekos, 3 Tr. 32) The building structure is comprised of heavy steel framing which supports bridge cranes as well as the building. (Chekos, 3 Tr. 32, 35–37; Racek, 2 Tr. 115)

The machine shop is used for repair and storage of various parts and equipment; various materials are stored in the west plant, the blooming mill, the line shop and the carpenter shop; and the carpenter shop is used for administrative offices. (Chekos, 3 Tr. 29; Kapusta, 6 Tr. 25–26) Each of these structures is located on the Donut, not on the Hole. (Chekos, 3 Tr. 29; Layout Drawing, Bank Group Ex. 2) Some of the buildings and structures not utilized under the scope of present operational design are structurally sound and have potential for use in connection with future pipe production. (Chekos, 3 Tr. 30) Specifically, the old blooming mill and the west plant building, both located on the Donut, could be utilized in future mill operation. (Chekos, 3 Tr. 31) The pipe mill cannot operate in a satisfactory commercial manner without utilizing the Donut as well as the Hole. (Kapusta, 6 Tr. 26)

A bridge crane consists of a box beam suspended across a bay of the building. (Chekos, 3 Tr. 35–36; Photograph, Bank Group Ex. 9) At either end of the box beam is an end truck with steel wheels that run on rails like a railroad car, enabling the bridge crane to travel the length of the building. (Chekos, 3 Tr. 37; Kapusta, 6 Tr. 67) Mounted on the box beam are (1) a trolley which runs back and forth across the beam and from which the hook is suspended, (2) all of the electrical controls, (3) the mechanical hoist system, and (4) in heavier cranes, a pulpit, or cab, for the operator. (Chekos, 3 Tr. 36; Photograph, Bank Group Ex. 9; Advertising Brochure, Bank Group Ex. 56) Electrical power is transferred from the building to the crane by an arm similar to the third rail arrangement on a subway. (Chekos, 3 Tr. 37) The wheels of the bridge crane ride on steel rails that rest on girders that are supported high above the floor of the building by the steel columns that also support the building. (Chekos, 3 Tr. 36–37) There are 12 bridge cranes in the open hearth building. (Kapusta, 6 Tr. 63) The three largest and most valuable bridge cranes that operate in the main high bay of the building (C Bay) were completely rebuilt by Hunt with new electrical and mechanical systems, including modern control systems. (Chekos, 4 Tr. 73) In the process, three of the other

cranes were cannibalized for parts. (Kapusta, 6 Tr. 63) The steel columns, crane girders and rails that support the bridge cranes are part of the open hearth building. (Chekos, 3 Tr. 37) The cranes themselves, however, are machinery, not part of the building. (Chekos, 3 Tr. 37) They can be removed from the building and installed in another. (Chekos, 3 Tr. 38; Kapusta, 6 Tr. 64) Bridge cranes are bought and sold as machinery through used machinery dealers. (Advertising Brochure, Bank Group Ex. 56) In fact, Hunt purchased three bridge cranes that were in another building, removed them, transported them to the pipe mill, shortened two of them to fit the spans in the pipe mill, installed two of them in the open hearth building and had the third ready to install. (Kapusta, 6 Tr. 63–65; Chekos, 3 Tr. 38–39) The bridge cranes were expressly treated as personal property in the purchase and sale contract for the property between Jones & Laughlin Steel Incorporated ("J & L") and Youngstown Industrial Corporation ("YIC"), from which Hunt acquired the property. (1/22/83 J & L/YIC Agreement, Bank Group Ex. 102, p. 3, ¶ 1.2, and schedule, pp. 3–4) The taxing authorities treat them as personal property. (Racek, 2 Tr. 179)

The bag houses are part of the pollution control system of the pipe mill. (Chekos, 3 Tr. 80) They consist of an equipment housing containing equipment that sucks in exhaust gases and removes particulate matter, much like a giant vacuum cleaner. (Chekos, 3 Tr. 80, 4 Tr. 15–18) The bag houses are not part of the open hearth building. (Chekos, 4 Tr. 17) Indeed, they are not even owned by Hunt; they were used by Hunt through a lease arrangement with the Ohio Air Quality Development Authority, which owns them. (1/22/82 J & L/YIC Agreement, Bank Group Ex. 102, pp. 5–10, ¶ 1.5; 1/22/82 YIC/Spitz Children Trust Agreement, Bank Group Ex. 101, pp. 5–6, ¶ 1.5)

The investment banking firm of Lazard Freres & Co. ("Lazard") became involved in this case in September, 1984, to find a purchaser of the pipe mill. (Lamb, 2 Tr. 71) By that time North Star had been analyzing the possibility of purchasing the pipe mill for several months. (Lamb, 2 Tr. 72) The Lazard search for a buyer was international in scope, covering the United States, Canada, Britain, Scandinavia, France, Germany, Holland, Austria and Japan. (Lamb, 2 Tr. 77, 79–81) However, only one potential purchaser agreed to visit the pipe mill at Lazard's suggestion: a German company which subsequently decided that it would not purchase the pipe mill. (Lamb, 2 Tr. 82–83) Although Lazard continued its marketing up through the date of trial, reporting the North Star offer to other potential customers in an effort to generate competing offers, only North Star made a firm offer. (Lamb, 2 Tr. 89–90, 96) North Star's offer is the best offer available for all of the assets described in the Amended Complaint.

YIC contends that it holds a lien on the Donut that has already been determined to be valid. (Judgment Entry of Foreclosure, Hunt Foreclosure Docket Entry 9) YIC claims that it has bid in the amount of the debt underlying YIC's lien on the Donut. (3/18/85 YIC Letter, Bank Group Ex. 111) YIC claims the right to bid its debt on the Donut alone, as the foreclosing lien holder on the Donut under Ohio law, and YIC further claims that the receiver is bound to act in accordance with Ohio law. (Arguments of Counsel, 8 Tr. pp. 6–10)

Mahoning National Bank of Youngstown ("MNB") claims to have a first lien on the Hole. (Argument of Counsel, 1 Tr. 40) MNB claims that this Court is required to permit it, as holder of a first lien, to bid in the amount of the debt underlying the lien. (Argument of Counsel, 1 Tr. 41–45) The participants in the MNB loan all aver that they would bid in the full amount of the loan, including interest. (Taylor, 8 Tr. 83–84, 9 Tr. 151–153; Paden, 9 Tr. 175; Dix, 9 Tr. 211; Varner, 9 Tr. 224–225) MNB, however, concedes that it would be silly to bid in at the full amount of the loan unless there were competing bids. (Taylor, 9 Tr. 151–152)

Pursuant to the terms of a loan agreement dated April 23, 1982 ("Loan Agreement"), Seattle-First National Bank, for itself and as agent bank for Bank of New England, N.A., Societe Financiere Europeenne Finance Company, N.V., American Security Bank, N.A., and Westinghouse Credit Corporation (collectively referred to as the "Bank Group"), obligated itself to make loans to Hunt from time to time in the aggregate maximum amount of $45,-000,000. (Loan Agreement, Bank Group Ex. 57, pp. 1–2, § 1.01) The Bank Group was obligated to advance the loan of $45,-000,000 under definite conditions expressed in the Loan Agreement. (Loan Agreement, Bank Group Ex. 57, pp. 2–3, 12–16, § 1.02, Article II) The Loan Agreement, in relevant part, provides that:

> Each Lender severally agrees on the terms and conditions of this Agreement to make loans (the "Loans") to the Borrower to enable it to construct, modernize and equip a mini-mill steel plant in Youngstown, Ohio (the "Plant"), from time to time on Business Days during the period beginning on the date of this Agreement and ending on December 31, 1982 (the "Commitment Period"), and aggregating for all Lenders the maximum sum of Forty-Five Million Dollars ($45,000,000) (herein called the "Commitment") . . .

(Loan Agreement, Bank Group Ex. 57, p. 1, § 1.01) The $45,000,000 loan was evidenced by a promissory note dated April 23, 1982, from Hunt to the Bank Group. ($45,000,000 Note, Bank Group Ex. 59) Interest on the $45,000,000 loan was payable monthly on the last day of each month at the rate of two percent over prime, as long as there was no default in payment, and at the rate of three percent over prime after default in payment. ($45,000,000 Note, Bank Group Ex. 59) Hunt agreed to repay $750,000 of the principal amount of the $45,000,000 loan on the last day of each month, commencing on January 31, 1983, and to pay the balance of the principal amount of the loan not later than December 31, 1987. (Loan Agreement, Bank Group Ex. 57, pp. 3–4, § 1.03)

The Bank Group advanced the $45,000,-000 loan as follows:

| Date | Amount |
| --- | --- |
| April 27, 1982 (as of April 23, 1982) | $17,259,438.00 |
| April 27, 1982 | 8,100,000.00 |
| April 28, 1982 | 123,669.62 |
| June 1, 1982 | 2,956,738.63 |
| July 6, 1982 | 6,638,776.60 |
| August 3, 1982 | 4,332,338.03 |
| September 1, 1982 | 5,354,385.03 |
| October 5, 1982 (as of October 4, 1982) | 234,654.09 |

($45,000,000 Note Ledger, Bank Group Ex. 60) There have been no repayments of principal on the $45,000,000 loan. (Schukar, 7 Tr. 108)

To secure the $45,000,000 loan, Hunt and the Spitz Children Trust delivered to the Bank Group an open-end mortgage and security agreement dated March 4, 1982, covering the Hole. ($45,000,000 Open-End Mortgage, Bank Group Ex. 61, p. 3, granting clause a and exhibit A) The Bank Group's open-end mortgage was received for recording at 1:03 P.M. on April 21, 1982. ($45,000,000 Open-End Mortgage, Ex. 61, cover) The $45,000,000 open-end mortgage contains the title "Open End Mortgage" on the cover page. ($45,000,-000 Open-End Mortgage, Bank Group Ex. 61, cover) It also contains the following provisions:

> The Mortgagee hereby acknowledges that it is obligated to disburse definite and certain sums under definite conditions in accordance with the provisions of the Loan Agreement to pay the cost of constructing, improving and equipping the Project Facilities on the Project Site.

($45,000,000 Open-End Mortgage, Bank Group Ex. 61, p. 26, § 6.4) "[T]he maximum amount of unpaid Loan indebtedness, exclusive of interest thereon, which may be outstanding at any time is $45,000,000." ($45,000,000 Open-End Mortgage, Bank Group Ex. 61, p. 27, § 6.5)

To secure the $45,000,000 loan, Hunt also delivered to the Bank Group a security agreement dated April 23, 1982, covering, *inter alia*, the fixtures, machinery and equipment located on the Hole. ($45,000,-000 Security Agreement, Bank Group Ex.

478

62, p. 2, ¶ 1[a][2]) The security interest granted by the $45,000,000 security agreement was properly perfected by (a) the filing of a Uniform Commercial Code financing statement with the Mahoning County Recorder at 1:00 P.M., on April 21, 1982 ($45,000,000 Fixture Filing, Bank Group Ex. 64; Mahoning Debtor Index, Bank Group Ex. 65), and (b) the filing of a Uniform Commercial Code financing statement with the Secretary of State of Ohio ($45,000,000 State Filing, Bank Group Ex. 63).

Russell W. Spitz personally guaranteed repayment of the $45,000,000 loan by executing a guaranty agreement dated April 23, 1982. (Guaranty Agreement, Bank Group Ex. 69) Mr. Spitz pledged his stock of Hunt to the Bank Group to secure his guaranty. (Pledge Agreement, Bank Group Ex. 70, p. 2, § 1[a]) The Bank Group perfected the pledge by taking possession of the stock certificates. (Stock Certificates, Bank Group Exs. 71–72; Schukar, 6 Tr. 93) The pledge agreement provides that after a demand for payment, the Bank Group can vote the pledged shares. (Pledge Agreement, Bank Group Ex. 70, p. 6, ¶ 4[b]) The Bank Group made demand for payment on March 21, 1985, during trial of this adversary proceeding. (3/21/85 Letter, Bank Group Ex. 73)

Pursuant to the terms of a first amendment to the loan agreement dated November 23, 1982, the Bank Group obligated itself to lend Hunt an additional $10,000,-000 under definite conditions expressed in the first amendment. ($10,000,000 First Amendment, Bank Group Ex. 78, pp. 2, 5, §§ 1, 7) The $10,000,000 loan was evidenced by a promissory note dated November 23, 1982, from Hunt to the Bank Group. ($10,000,000 Note, Bank Group Ex. 79) Interest on the $10,000,000 note was payable monthly on the last day of each month at the rate of three percent above prime, and at the rate of five percent above prime after default in payment. ($10,000,-000 Note, Bank Group Ex. 79) Hunt agreed to repay the principal amount of the $10,000,000 note in monthly installments of ¹⁄₆₀th of the principal amount outstanding on June 30, 1983, commencing on June 30, 1983, with payment in full due on December 31, 1987. ($10,000,000 Note, Bank Group Ex. 79) Mr. Spitz personally guaranteed payment of the $10,000,000 loan. ($10,000,000 First Amendment, Bank Group Ex. 78, p. 9, § 15, and p. 11)

The Bank Group advanced the $10,000,000 loan as follows:

| Date | Amount |
| --- | --- |
| December 13, 1982 (as of December 9, 1982) | $2,300,000.00 |
| December 22, 1982 | 5,375,176.77 |
| January 4, 1983 | 2,168,315.55 |
| February 3, 1983 | 156,507.68 |

($10,000,000 Note Ledger, Bank Group Ex. 80) There have been no repayments of principal on the $10,000,000 note. (Schukar, 7 Tr. 108)

To secure the $10,000,000 loan, Hunt and the Spitz Children Trust delivered to the Bank Group an open-end mortgage and security agreement on the Hole dated November 23, 1982, which it tendered for recording in Mahoning County Records on December 9, 1982. ($10,000,000 Open-End Mortgage, Bank Group Ex. 81, cover, p. 3, granting clause a, and exhibit A)

To secure the $10,000,000 loan, Hunt also delivered to the Bank Group a security agreement dated November 23, 1982, covering, *inter alia*, the fixtures, machinery and equipment located on the Hole. ($10,-000,000 Security Agreement, Bank Group Ex. 82, p. 2, ¶ 1[a][2]) The security interest granted by the $10,000,000 security agreement was properly perfected by (a) the filing of a Uniform Commercial Code financing statement with the Mahoning County Recorder on January 21, 1983 ($10,-000,000 County Filing, Bank Group Ex. 84), and (b) the filing of a Uniform Commercial Code financing statement with the Secretary of State of Ohio on January 25, 1983 ($10,000,000 State Filing, Bank Group Ex. 83).

Hunt delivered to the Bank Group a second amendment to the loan agreement, agreeing to defer certain interest payments in exchange for notes in the amounts of the

interest due at five percent above prime. (Second Amendment, Bank Group Ex. 85, pp. 2–3, ¶ 2[a]) Pursuant to the second amendment, Hunt delivered to the Bank Group notes at five percent over prime for $611,506.84, $592,397.27, $347,260.27, $300,-821.92 and $75,342.47, dated June 1, July 1, August 1, September 1 and September 1, 1983. (Capitalized Interest Notes, Bank Group Exs. 86–90; Schukar, 6 Tr. 103) As of Friday, March 22, 1985, Hunt was indebted to the Bank Group in the amount of $77,701,815.94, including interest and fees. (Schukar, 6 Tr. 106) Mr. Spitz is liable to the Bank Group for the same amount on his guarantees. (Guaranty Agreement, Bank Group Ex. 69; First Amendment, Bank Group Ex. 78, p. 9, § 15, and p. 11)

The Spitz Children Trust and Mr. Spitz delivered to MNB a promissory note dated March 4, 1982, in the face amount of $5,000,000. (MNB Note, MNB Ex. 10) The MNB note was altered twice after it was delivered to MNB: once to add a provision for a minimum interest rate of 15 percent (Taylor, 8 Tr. 71–72, 9 Tr. 126; Paden, 9 Tr. 183–184), and a second time to add Hunt as a co-maker with a primary obligation to pay it (Taylor, 8 Tr. 103–107, 108, 9 Tr. 126–128, 151; Paden, 9 Tr. 186–188, 189–194, 196–197; *see* Dix, 9 Tr. 210; Varner, 9 Tr. 220, 225–226). (*See* MNB Note, MNB Ex. 10; *compare* MNB Note, Ex. 10, *with* 5/4/82 MNB Letter to Farmers, Bank Group Ex. 125; 5/13/82 MNB Letter to Farmers, Bank Group Ex. 127, p. 1; Farmers Certificate of Participation, MNB Ex. 17, p. 2, Bank Group Ex. 127, p. 2; Farmers Report for New Note, Bank Group Ex. 128; *and* 1/20/83 Farmers Executive Loan Committee Loan Application Data, Bank Group Ex. 130) Hunt was added to the MNB note as an obligor at the instance of The Home Savings and Loan Company ("Home"), at the time Home became a participant in the loan on February 23, 1983. (Taylor, 8 Tr. 104–105)

The Spitz Children Trust delivered to MNB a standard form real estate mortgage deed dated March 4, 1982, covering the Hole. (Bank Group Ex. 119) The MNB real estate mortgage, like the MNB note,

was prepared by Mr. Spitz's attorneys. (Taylor, 8 Tr. 71, 107–08, 113) The MNB real estate mortgage was tendered for recording in the Mahoning County Records at 1:01 P.M. on April 21, 1982, one minute after the filing of the Bank Group's fixture filing and two minutes before the recording of the Bank Group's $45,000,000 open-end mortgage. (MNB Real Estate Mortgage, Bank Group Ex. 119; $45,000,000 Fixture Filing, Bank Group Ex. 64; Mahoning Debtor Index, Bank Group Ex. 65; $45,-000,000 Open-End Mortgage, Bank Group Ex. 61, cover) The MNB Real estate mortgage provides, in relevant part, that:

> [T]he Grantor for and in consideration of the sum of *Five Million and no/100* DOLLARS *($5,000,000.00)* received to *his* full satisfaction of THE MAHONING NATIONAL BANK OF YOUNGS-TOWN, Youngstown, Ohio, the Grantee, do ___ [sic] GIVE, GRANT, BARGAIN, SELL and CONVEY unto the said Grantee, its successors and assigns, the following described real estate, to-wit: Situated in the *City* of *Youngstown*, County of *Mahoning* and State of Ohio, and known as:
>
> SEE
>
> *For description "EXHIBIT A" Attached here to* [sic]
>
> be the same more or less, but subject to all legal highways.
>
> TO HAVE AND TO HOLD the above described premises with the appurtenances thereunto belonging, unto the said Grantee, its successors and assigns forever.

(MNB Real Estate Mortgage, Bank Group Ex. 119) The quoted language is part of a printed MNB standard form with the underscored language typewritten in. (MNB Real Estate Mortgage, Bank Group Ex. 119) The "Exhibit A" referred to in the MNB real estate mortgage legally described the real estate comprising the Hole. (MNB Real Estate Mortgage, Bank Group Ex. 119) There is no reference in the MNB real estate mortgage to a security interest

in fixtures, machinery or equipment. (*Cf.* MNB Real Estate Mortgage, Bank Group Ex. 119) The MNB real estate mortgage is not titled "Open-End Mortgage," does not refer to any obligation to advance funds under specified conditions, and does not state the maximum principal amount of funds to be so advanced. (MNB Real Estate Mortgage, Bank Group Ex. 119) In taking the MNB mortgage as security, the participants relied on a grossly inflated appraisal. (Taylor, 8 Tr. 109–112; Paden, 9 Tr. 178) They disregarded their personal knowledge of Youngstown real estate values (*see* Taylor, 9 Tr. 142–146; Paden, 9 Tr. 178) and never asked Mr. Spitz how much he had paid for the property a couple months earlier. (Taylor, 9 Tr. 138–140; Paden, 9 Tr. 178–180)

The MNB loan was advanced as follows:

| Date | Amount |
|---|---|
| May 6, 1982 (MNB) | $1,000,000 |
| May 13, 1982 (MNB) | 500,000 |
| May 13, 1982 (Farmers National Bank) | 500,000 |
| February 11, 1983 (Dollar Savings & Trust) | 2,000,000 |
| February 23, 1983 (Home) | 1,000,000 |

(Reese Handwritten Notes, Bank Group Ex. 120; Taylor, 8 Tr. 73–74, 75–76) On the date of the first advance, the Bank Group had already advanced $25,483,107.62 of the $45,000,000 loan. ($45,000,000 Note Ledger, Bank Group Ex. 60) By the time of the last two advances, the Bank Group had advanced the entire amount of both the $45,000,000 loan and the $10,000,000 loan. ($45,000,000 Note Ledger, Bank Group Ex. 60; $10,000,000 Note Ledger, Bank Group Ex. 80)

Two of the original participants in the MNB loan, McDowell Bank ("McDowell") and Union National Bank ("Union"), reneged on their participation. (Taylor, 8 Tr. 85–86; *compare* 12/18/81 Loan Application, MNB Ex. 7, *with* 2/16/82 Loan Application, MNB Ex. 8) Union reneged sometime after February 16, 1982. (Taylor, 8 Tr. 85–86; *cf.* 2/16/82 Loan Application, MNB Ex. 8) On February 16, 1982, MNB made a vague commitment to Mr. Spitz to head the loan and to attempt to obtain additional participants. (Taylor, 8 Tr. 117–121; *see* Taylor, 8 Tr. 95, 9 Tr. 135–137, 146–149, 150–151) MNB had difficulty finding banks to replace McDowell and Union. (Taylor, 8 Tr. 97–98) Dollar Savings & Trust ("Dollar") and Home were eventually added as participants after the initial disbursements on the MNB loan were made. (Taylor, 8 Tr. 98, 87–90, 95, 120–121; Dix, 9 Tr. 213–215; *see* Varner, 9 Tr. 219–220, 225–226) During the time before Dollar and Home became participants, there was no legal obligation to advance the full $5,000,000, because it exceeded the maximum combined legal lending limits on MNB and Farmers National Bank ("Farmers"). (Taylor, 8 Tr. 98–99; Paden, 9 Tr. 190–191) During the period before Dollar and Home became participants, Mr. Spitz asked for funds beyond the initial $2,000,000, but was unable to obtain them. (Taylor, 9 Tr. 148) When Dollar and Home finally · did become participants, they charged loan fees that were not provided for in the original loan. (Taylor, 9 Tr. 133–134; *compare* 2/10/83 Dollar Participation Agreement, MNB Ex. 13, ¶ 3, *and* Home Participation Agreement, MNB Ex. 14, ¶ 3, *with* MNB Note, MNB Ex. 10) MNB never made either a written or an oral agreement that absolutely obligated it to advance the entire $5,000,000. (Taylor, 8 Tr. 119)

The Bank Group's open-end mortgage contains the following representation by Hunt and the Spitz Children Trust:

Section 2.1 *Warranties and Representations.* The Mortgagor [Hunt and the Spitz Children Trust] warrants, represents and agrees that … (b) the lien of this Mortgage is a good and valid mortgage lien on the Mortgaged Property [the Hole] that is second in priority only to a first mortgage in the maximum amount of $5,000,000 held by a group of banks in the Youngstown, Ohio, area, and a good and valid first security interest in all personal property included in the Mortgaged Property. …

($45,000,000 Open-End Mortgage, Bank Group Ex. 61, p. 7)

The Bank Group's Loan Agreement contains the following provision in the article entitled "Conditions of Lending":

The obligations of the Lenders to make any advance of the Loans is subject to fulfillment of the following conditions:

. . . .

Section 2.05 *Evidence of Security; Other Information.* The Agent [Seattle First National Bank] shall have received . . . (b) evidence satisfactory to the Lenders [the Bank Group] that the liens and security interests created by the Mortgage, Assignment of Lease, Pledge Agreement and Security Agreement on the Collateral described therein have been duly perfected by recording or the filing of all such Uniform Commercial Code financing statements and the taking of all such other or additional acts as may be necessary to create a valid and perfected lien of first priority (except to the extent that the liens of the Mortgage and Assignment of Lease may constitute liens of second priority in the event there is a First Mortgage that has been approved by the Majority Lenders [51 percent in amount of the Bank Group] in writing) enforceable against all third parties in all jurisdictions to secure all obligations of the Borrower [Hunt] to the Lenders under this Agreement and the Note. . . .

($45,000,000 Loan Agreement, Bank Group Ex. 57, pp. 12, 13–14) The following provision appears in the article of the Bank Group's Loan Agreement entitled "Representations and Warranties":

The Borrower [Hunt] represents and warrants to the Lenders [Bank Group] as follows:

. . . .

Section 3.09 *Lien Priority.* On the date of any Loan, . . . (iii) the Mortgage, Assignment of Lease, Pledge Agreement and Security Agreement will together constitute a valid and perfected lien of first priority (except to the extent the Mortgage constitutes a lien of second priority as permitted under Section 2.05 above) in and to all of the Collateral and

will be enforceable against all third parties in all jurisdictions as security for all obligations of the Borrower [Hunt] to the Lenders under this Agreement and the Note.

($45,000,000 Loan Agreement, Bank Group Ex. 57, pp. 16, 20) In the article of the Bank Group's Loan Agreement entitled "Negative Covenants" the following provisions appear:

So long as the Commitment of the Lenders shall be outstanding and until payment in full of the Loans and the Note and performance of all other obligations of the Borrower under this Agreement, the Borrower [Hunt] and Guarantor [Mr. Spitz] agree that they will not do or permit any of the Consolidated Subsidiaries to do any of the following unless the Majority Lenders [51 percent in amount of the Bank Group] shall otherwise consent in writing:

. . . .

Section 5.03 *Indebtedness.* The Borrower shall not create, incur or become liable for any Indebtedness except . . . (vii) Indebtedness secured by the First Mortgage.

. . . .

Section 5.06 *Liens.* The Borrower and Guarantor shall not create, assume or suffer to exist any Lien except . . . (iv) the First Mortgage.

($45,000,000 Loan Agreement, Bank Group Ex. 57, pp. 34, 35–36, 37–38) In the article of the Bank Group's Loan Agreement entitled "Definitions," the term "First Mortgage" is defined as follows:

*"First Mortgage"* means a mortgage on the Plant real property and an assignment of the Lease held by a group of banks in the Youngstown, Ohio, area, and securing indebtedness not in excess of Five Million Dollars ($5,000,000), copies of which have been furnished to the Lenders.

($45,000,000 Loan Agreement, Bank Group Ex. 57, p. 58)

MNB never obtained from the Bank Group either a subordination agreement (Taylor, 8 Tr. 114, 116–117, 9 Tr. 135, 162)

or the approval of the MNB real estate mortgage required by the Bank Group's Loan Agreement. (Taylor, 8 Tr. 114–116; see $45,000,000 Loan Agreement, Bank Group Ex. 57, pp. 12, 13–14, § 2.05) None of the participants in the MNB loan relied on any provision in the Bank Group's loan documents; indeed, they never even saw any of those documents. (Taylor, 8 Tr. 114–115, 9 Tr. 161–162; Paden, 9 Tr. 173; Dix, 9 Tr. 209–210)

All payments for the Donut were made by Hunt, not by the Spitz Children Trust. In connection with the June 2, 1981 purchase agreement, Hunt made the $10,000 down payment to YIC. (Klein, 7 Tr. 184–185; Klein Support, Bank Group Ex. 113) On June 30, 1981, Hunt made an additional $90,000 payment to YIC with respect to the pipe mill property. (Klein, 7 Tr. 186–187; Klein Support, Bank Group Ex. 114; 6/2/81 Letter, Bank Group Ex. 112; 6/25/81 Rubenstein Memo, Bank Group Ex. 94; 6/26/81 Hunt Telex, Bank Group Ex. 95; Undated Hunt Telex, Bank Group Ex. 96) The $1,600,000 paid at the closing was wire-transferred from the Hunt Bank account at Seattle First National Bank to the Hunt Bank account at MNB, and used by MNB to fund a cashier's check signed by Mr. Taylor "Ref: Spitz Children Trust" that was delivered to YIC's attorneys. (Klein, 7 Tr. 187–190; Varley, 7 Tr. 174–175; Taylor, 9 Tr. 130; $1,600,000 Cashier's Check, Bank Group Ex. 106; Klein Support, Bank Group Ex. 115) On February 24, 1983, Hunt made a $400,000 principal payment to Philadelphia National Bank, assignee of the MNB mortgage. (Klein, 7 Tr. 190–191; Varley, 7 Tr. 178–179; Klein Support, Bank Group Ex. 116; Summary of Payments on YIC Loan, Bank Group Ex. 110) A $200,000 principal payment was made on April 5, 1983, with money withdrawn from Hunt by Mr. Spitz the previous day. (Klein, 7 Tr. 191–192; Klein Support, Bank Group Ex. 117; Summary of Payments on YIC Loan, Bank Group Ex. 110) The interest payments were also made by Hunt. (Varley, 7 Tr. 178; 2/12/82 Hunt Letter, Bank Group Ex. 108; 2/15/82 Hunt Letter, Bank Group Ex. 109)

These amounts were reflected in Hunt's financial statements as a loan to Spitz (Spitz Ex. E, p. 16).

On November 21, 1984, YIC filed a motion with this Court for relief from the automatic stay to proceed with a foreclosure action commenced in the Mahoning County Court of Common Pleas. (Hunt Docket Entry 249) At the December 19, 1984 hearing on YIC's motion for relief from the automatic stay, the Bank Group supported YIC on the understanding that the Bank Group would remove the foreclosure action to this Court so that the action could be tried expeditiously and the Donut sold as part of the pipe mill. (12/19/84 Transcript, Bank Group Ex. 118, pp. 15–17, 58–59, 61–63) In this way, YIC was able to take advantage of the efforts to market the pipe mill that the Bank Group had financed (12/19/84 Transcript, Bank Group Ex. 118, pp. 58–59), so that the pipe mill could be sold as a whole (12/19/84 Transcript, Bank Group Ex. 118, p. 16). This Court entered a judgment terminating the automatic stay as to YIC on January 2, 1985. (Hunt Docket Entry 291)

On January 2, 1985, Seattle First National Bank, a defendant in the Mahoning County foreclosure action, removed that action to this Court pursuant to 28 U.S.C. Section 1452, without objection from any party and with the consent and assistance of YIC. (Hunt Foreclosure Docket Entry 1) On January 18, 1985, YIC tried its sixth claim for relief. (Hunt Foreclosure Docket Entry for 1/18/85) On February 13, 1985, this Court entered a judgment entry of foreclosure on YIC's sixth claim for relief, appointing Alex Mekedis receiver of the real estate with authority to sell "at either private or public sale in connection with any sale" of the Hunt pipe mill. (Judgment Entry of Foreclosure, YIC Ex. 1, p. 5; Judicial Notice Taken, 7 Tr. 210)

Except for the Hart-Scott-Rodino Antitrust Act of 1976, Hunt is not subject to any court decree or any statute or regulation requiring it to obtain the consent or approval of any federal, state or local

government or governmental body or authority for the consummation of the transactions contemplated hereby. (Kapusta, 6 Tr. 23)

Neither the execution and delivery by Hunt of the Purchase Agreement and other documents and instruments to be delivered by Hunt, nor the performance by Hunt of its obligations thereunder will (a) conflict with or result in a non-waived breach of the terms, conditions or provisions of the articles of incorporation or regulations of Hunt, or any contract, agreement, lease, mortgage, trust, deed, note, bond, indenture or other instrument or obligation of any nature to which Hunt is a party or by which Hunt is bound or by which Hunt, the pipe mill or the assets may be affected; or (b) contravene or violate any statute or any judicial or governmental regulation, order, injunction, judgment or decree or require the approval consent or permission of any governmental or regulatory body or authority. (Kapusta, 6 Tr. 24)

Hunt is not aware of any suit, action, arbitration proceeding or investigation pending or threatened against it, or to which it is otherwise a party, or which may affect the pipe mill or the assets before any court, or before any governmental department, commission, board, agency or instrumentality; nor does Hunt know of any basis for any such action, proceeding or investigation. (Kapusta, 6 Tr. 23)

Hunt has complied with all laws, regulations, writs, injunctions, decrees and orders applicable to it or to the acquisition, construction and operation of the pipe mill, and has received no notice of any alleged violation of any such law, regulation, writ, injunction, decree or order. (Kapusta, 6 Tr. 23) Hunt has complied with all applicable federal, state and local laws, ordinances or regulations relating to occupational safety and health and the environment in connection with the operation of the pipe mill, except that it is in the process of cleaning up a PCB spill pursuant to an EPA order, and except that it must comply with an OSHA order regarding safety devices when the continuous caster is restarted. (Kapusta, 6 Tr. 21–23)

*Discussion*

North Star's offer of $22,500,000 for the mini-mill assets is a fair price. Lazard made intensive efforts to find potential buyers for this property, and North Star's offer is the only one before this Court. The testimony of witnesses for the Bank Group, which was wholly credible and unassailable in every important aspect, is that the fair market value for the mill is between $16,000,000 and $27,000,000. This figure assumes better than average market penetration by a purchaser, and a relatively low level of competition from importers of tubular steel products. This figure also takes into account the physical condition of the mill equipment, the general market for tubular steel products and the functional obsolescence of the mill facilities, which were originally built to manufacture steel, not to manufacture pipe. The Court is satisfied that $22,500,000 is a fair offer and the best offer received for these assets.

The mortgage of MNB is junior to the $45,000,000 open-end mortgage held by the Bank Group. MNB's mortgage does not comply with the requirements of Ohio Revised Code Section 5301.232, which allows priority from the date of filing a mortgage to secure future advances. Under Section 5301.232(F), "other mortgages permitted by law" may arguably be used to secure future advances. An examination of Ohio case law, however, reveals that MNB's mortgage would not be entitled to protection under Ohio common law.

In support of its position, MNB cites the case of *Kuhn v. Southern Ohio Loan & Trust Co.*, 101 Ohio St. 34, 126 N.E. 820 (1920). The first paragraph of the syllabus of that case reads as follows:

A mortgage duly recorded, given for definite future advances which the mortgagee is obligated to make, is entitled to priority for the full amount of such advances over a subsequent mortgage recorded after the former one though prior to the making of such future advances. (*Spader et al v. Lawler,* 17 Ohio, 371, distinguished.)

If the advances of MNB were obligatory, the mortgage of MNB might be entitled to priority.

In *Wayne Building & Loan Co. v. Yarborough,* 11 Ohio St.2d 195, 228 N.E.2d 860 (1967), paragraph 6 of the syllabus reads:

Such advances are not obligatory where the instruments introduced on behalf of the mortgagee, and constituting its entire agreement with the mortgagor concerning the mortgage loan, evidence no obligation to disburse definite and certain sums, under definite conditions, or in a particular manner. The existence of discretion on the part of the mortgagee as to the amounts to be disbursed under particular conditions is inconsistent with the existence of obligatory advances.

In *Second National Bank of Warren v. Boyle,* 155 Ohio St. 482, 99 N.E.2d 474 (1951), paragraph 1 of the syllabus reads:

Where there is no obligation to make future advances, a mortgage, purporting to secure such future advances, cannot secure such advances until the advances have been made. Until then, so far as such advances are concerned, there is nothing for the mortgage to secure.

The mortgage introduced by MNB evidences no obligation to make future advances whatsoever. The testimony of MNB's vice-president, Terrence Taylor, was that he never made a definite commitment, either orally or in writing, to advance the full $5,000,000; MNB's only commitment was to act as lead bank in the loan participation and to attempt to find other participants. Taylor testified he had virtually unfettered discretion to determine the order in which each of the banks would advance funds to Hunt. (Taylor, 8 Tr. 94) This kind of discretion is inconsistent with the kind of showing required to meet the test of *Yarborough, supra.*

Mr. Taylor further testified that if he did not find other participants after two of the original participating banks, McDowell and Union, withdrew, MNB could not have made the $5,000,000 loan to the Spitz Children Trust, because MNB could not legally fund a loan of this size. (Taylor, 8 Tr.

97–99) MNB was, therefore, under no obligation to disburse a definite and certain sum, under definite conditions, or in a particular manner. Since MNB's mortgage does not meet the requirements of an open-end mortgage, MNB is entitled to priority only as of the date it actually advanced funds. By that date, May 6, 1982, the Bank Group had already advanced $25,483,-107.62 of its $45,000,000 loan. Thus MNB's entire loan is subordinated to the $25,483,107.62 advanced by the Bank Group.

The lien of YIC, however, is valid and entitled to priority over any possible lien of the Bank Group on the premises known as the Donut. The lien of YIC on this property has already been determined to be the first and best lien. (Judgment Entry of Foreclosure, Hunt Foreclosure Docket Entry 9)

Section 363(f) of the Bankruptcy Code reads:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Since this sale is proceeding under Section 363(b), no sale can be approved unless one of these five conditions is met. Subsections (1), (2), (3) and (4) are not met in this sale, since MNB and YIC are not consenting, the aggregate value of the liens exceeds the sale price, the interests of MNB and YIC are not in bona fide dispute and applicable nonbankruptcy law will not permit sale free and clear of those interests.

The issue before this Court, therefore, is whether MNB and YIC could be compelled in a legal or equitable proceeding to accept a money satisfaction of their interest. This Court finds they could be compelled, in the context of a cram-down under Section 1129(b) of the Code. Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided he received "the indubitable equivalent" of his claim. If YIC's lien is transferred to the fund created by the proceeds of this sale, subject to further valuation by this Court at a hearing under Section 506(a), the requirements of section 1129(b)(2)(A) would be met. Similarly, the lien of MNB would be transferred to the fund, but since it would be subordinated to the lien of the Bank Group for $25,483,-107.62 and the lien of YIC for $3,800,000, MNB would be unable to claim any of the proceeds of the $22,500,000 sale to North Star. YIC's secured claim may be reduced at a further valuation hearing, but the Bank Group is entitled to whatever proceeds are not subject to YIC's secured claim.

A plan or reorganization which involves a sale such as is proposed here would meet the "fair and equitable" test of Section 1129(b)(2), since the holders of the liens will receive "the indubitable equivalent" of their liens. (Section 1129[b][2][A][i], [iii]) There is no doubt that the highest value of this property is represented by the North Star bid. Though MNB finds its claim wholly unsecured, the lack of security arises from the reduced value of the land and MNB's junior lien position. If this sale were part of a proposed plan, MNB would be receiving "the indubitable equivalent" of its junior lien position.

### Conclusions of Law

Hunt gave timely notice of its Motion To Sell To North Star and the hearing thereon, in the manner in which, and to each person and entity to whom or to which, it is required by the Bankruptcy Code, 11 U.S.C. Sections 101, *et seq.* to give such notice. Bankruptcy Rule 2002(a)(2). (Hunt Exs. 3, 4, 9 and 10)

The Bank Group is entitled to vote the 480,000 shares of Hunt that it holds pursu-ant to the pledge agreement, and its vote in favor of the North Star sale will be valid.

Sale of the pipe mill for the best possible price will benefit the estate by reducing the portion of under-secured claims that will become unsecured claims against the estate under Section 506(a) of the Bankruptcy Code, 11 U.S.C. Section 506(a).

The sale of the pipe mill to North Star should be approved, because it is in the best interest of the estate. *See, Seychelles, Partnership & Genius Corp. v. Banyan Corp.,* 32 B.R. 708, 711 (N.D.Tex. 1983).

Hunt may sell the pipe mill without a plan, because it has good business reasons to do so. *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir.1983); *In re Baldwin-United Corp.,* 43 B.R. 888, 905 (Bankr.S.D.Ohio 1984).

Hunt may sell the pipe mill free and clear of liens, because the secured creditors could be compelled in a cram-down under Section 1129(b)(2) of the Code to accept money satisfaction of their interests. Bankruptcy Code Section 363(f)(5) [11 U.S.C. § 363(f)(5) ]; 1129(b)(2)(A).

The MNB mortgage covers only real estate with appurtenances, and does not include the bridge cranes and bag houses because they are personal property. *Szilagy v. Taylor,* 63 Ohio App. 105, 25 N.E.2d 360 (1939); *Investment Co. of Philadelphia v. Ohio & N.W. Ry. Co.,* 41 F. 378, 381 (S.D.Ohio 1889).

The MNB mortgage does not include the bag houses, because they were not owned by its grantor, the Spitz Children Trust.

The Bank Group has priority over MNB with respect to all of the machinery installed by Hunt in the open hearth building. Ohio Rev.Code Ann. § 1309.32(D)(1)(b) (UCC § 9–313[4][b] ).

The Bank Group is entitled to priority over the MNB's real estate mortgage to the extent of $25,483,107.62, the advances made by the Bank Group prior to any advances made by MNB. MNB would have second priority for the $2,000,000 advanced

by it on May 6, and May 13, 1982. The Bank Group has the third priority for the additional $29,516,892.38 advanced by it prior to MNB advancing any further funds. *Spader v. Lawler*, 17 Ohio 371, 379.

The representations, warranties and covenants in the Bank Group's $45,000,000 loan agreement and $45,000,000 open-end mortgage referring to priority of a real estate mortgage on the Hole do not subordinate the Bank Group to MNB, because they do not constitute a subordination agreement between the Bank Group and MNB. *Wayne Building & Loan Co. v. Yarborough*, 11 Ohio St.2d 224, 227–228, 228 N.E.2d 860 (1967); *Bercaw v. Cockerill*, 20 Ohio St. 163, 166–167 (1870).

YIC has the first and best lien on the real estate referred to as the Donut. (Judgment Entry of Foreclosure, Hunt Foreclosure Docket Entry 9)

All liens should attach to the proceeds of the North Star sale and be satisfied out of those proceeds to the extent of the fair market value of the collateral securing the lien.