**In re RED OAK FARMS, INC., Debtor.**

**The MUTUAL LIFE INSURANCE COMPANY OF NEW YORK and Bank of Wheaton, Plaintiffs,**

v.

**RED OAK FARMS, INC., Defendant.**

**Bankruptcy No. 82–1630–S–11.**
**Adv. No. 83–0442–S–11.**

United States Bankruptcy Court, W.D. Missouri, S.D.

Feb. 15, 1984.

Linda Gershon, Kansas City, Mo., for Mutual Life Insurance of New York.

Timothy R. Whelan, Joplin, Mo., for Bank of Wheaton.

Gary A. Love, Springfield, Mo., for debtor.

Donald R. Kronenberger, Jr., Acting Regional Atty., Dept. of Agriculture, Kansas

City, Mo., for Farmers Home Administration.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

In this Chapter 11 case debtor proposes to sell a portion of its real estate to fund its cattle raising operation. Mutual of New York, hereinafter Mony, holds a security interest in the real estate. It opposes the sale and proposed use of the proceeds. Bank of Wheaton holds a security interest in cattle owned by the debtor. The Bank has filed a Complaint to Lift the Stay, in which Mony joins, alleging that reorganization is not feasible.

A hearing was held at which the parties appeared by representatives and by counsel. Evidence was presented and the matter taken under advisement pending the receipt of briefs which have now been filed.

Section 362(d) of the Code, Title 11, U.S.C., provides that "after notice and a hearing, the court shall grant relief from the stay ... for cause, including the lack of adequate protection ... or ... against property; if—(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization". The provision "for cause" clearly contemplates other grounds for relief than a lack of adequate protection.

The evidence shows that debtor has little or no equity in the land over Mony's claim, at the time of the hearing, of approximately $1,050,000. When considering the second of FmHA, there is clearly no equity. While there is a dispute as to the value of the cattle (496 head) and machinery securing the loan from the Bank, the Court finds that debtor does have equity in that property.

Debtor owns subject to mortgage 1370 acres. It proposes to sell and lease back 585 acres for the sum of $150,000. The lease back will cost $22,500 annually. Debtor also retains an option to repurchase the land within three years for the sale price without credit for lease payments. With the proceeds of the sale debtor proposes to purchase 400 head of feeder cattle at the rate of 100 head per month. The cost of the purchase will be $100,000. The balance of the funds will be used to pay the first increment of rental (six months at $11,250) and to pay for feed and other costs of raising the 400 head. At the time of the fifth purchase, assuming no misfortune, the process will fund itself.

On an annual basis debtor anticipates grossing $663,000 from this feeder operation. Apparently no income is derived from the 496 head of cattle presently on the farm. The Bank asserts that this gross income produces a small loss and that the payments of interest are insufficient to fund the debt. While many of the charges against income are not disputed, there is disagreement as to the amount of feed cost. The amount in contention is about $50,000. The only testimony on this issue came from debtor on testimony and from his contradictory deposition. The Court cannot make a finding as to the accuracy of the feed costs but will assume for the purposes of this ruling that the figures recited at the hearing are correct. These present about $79,000 for debt service, about $12,500 for payment on long term debt and show a small loss.

Debtors propose to pay Mony in full over an extended period of time. The evidence at the hearing suggested 25 to 30 years. Debtors propose to treat FmHA as unsecured, contending that the value of the real estate does not exceed the amount owing to Mony. The evidence of value suggests that the analysis is accurate. The Court makes no such finding at this time. Debtors propose to pay Bank of Wheaton nothing until the litigation involving the Bank is concluded. After the sale and confirmation, assuming no misfortunes, the debtors could fund the reorganization.

The debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate, only if—

"(1) only nonbankruptcy law permits sale of such free and clear of such interest;

"(2) such entity consents;

"(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;

"(4) such interest is in bona fide dispute; or

"(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest". Section 363(f) of the Code.

The evidence shows that the sale could not be approved under the provisions of Section 363(f)(2), (3) or (4) of the Code. There is no consent, the price is not greater than the lien and the lien is not disputed.

■ Debtors point to no nonbankruptcy law which would permit the sale. Therefore, the provisions of Section 363(f)(5) are the only basis for approval. The requirements are written in the disjunctive and it is sufficient if the Court finds that one is met. 2 Collier on Bankruptcy ¶ 363.07 (15th Ed.). The process of compulsion could occur in the context of cramdown (Section 1129(b) of the Code).

■ Under the provisions of Section 1129(b)(2)(A) a plan may be crammed down on a secured creditor if the lien is retained, the deferred cash payments are equivalent to present value and the creditor realizes "the indubitable equivalent" of the claim. Debtors propose to subject the purchased cattle to the lien held by Mony. They propose to pay the claim in full. The question is whether Mony will realize the indubitable equivalent of its claim.

At the time of closing debtor proposes to pay the buyer $11,250 as the first installment on the least payment. At that moment Mony's lien will attach to only $138,750, which is not the indubitable equivalent of $150,000, the sale price, or even the value of the land assuming that the sale price is fair market value, a matter of some dispute. Mony will also have some rights to a six month lease and an option to repurchase, of little or no value to Mony.

At the hearing debtor testified that it would purchase 100 head of feeder cattle a month at a cost of $25,000. Additional purchases of 100 head will be made in succeeding months and the first purchase will be sold after 120 days at a price of $40,000. This process will go on allowing an accumulation of cash to the gross totals set out above.

At the end of four months, debtor will have purchased 400 head at a cost of $100,000 and will have spent $144,630. The cattle will be worth $130,000 assuming even increments of growth and no misfortune. Thus at that time Mony will have a security interest in collateral of a value of $130,000, $5,370 in cash and the leasehold and option to purchase, all of a value less than $150,000.

After 5 months and the sale of the second 100 head Mony will have an interest in $130,000 in cattle, the leasehold, the option to purchase and some $18,700 in cash. At this time and hereafter in the process the value of the collateral and excess cash will exceed $150,000 until such time as debtor must make the payment to Mony at which time the process of being undersecured starts over.

Debtor proposes to give Mony as additional security an interest in the Harvestores. This proposal was not well developed at the hearing. It is admitted that debtor used part of the Mony loan to pay off the purchase money mortgage on the facility. There is a question then whether Mony does not already have a purchase money security interest in that which debtor offers as an additional security. The issue was not addressed by the parties in their briefs. The evidence is insufficient to enable the Court to rule the question.

Debtor's proposal is based upon several assumptions. The first of these is that the price to be paid for the land is a reasonable value. In other postures both debtor and Mony value this property at substantially more than is being paid. It has been for sale; there have been no offers. The market is depressed. This price is colored by reservation of the option as well as the lease payments. It does not represent fair market value.

The second assumption debtor makes is that there will be no variances in the cattle market. Since the turn over of the herd occurs within a short period of time the chances of substantial variance between purchase and sale prices are small. But there is a possibility of change so that high purchase prices could be followed by low sale prices. This would have some, albeit minimal, impact on cash flow.

The third assumption is that costs of production would remain constant. Again this is a relative cost which has little impact in a short trading cycle but if the price of cattle were to go down while the cost of feed stayed constant or went up, the profitability of the transaction would be jeopardized. That, in turn, results in an inability to fund the plan.

The fourth assumption is that no misfortune would occur. Debtor is in bankruptcy partially because of a drought. Weather problems are cyclical and without capital reserves cannot be guarded against. Debtor's projections show little accumulation of capital. Similarly the projections do not consider misfortune. There is no allowance for losses due to disease or lack of gain. In his testimony debtor's representative admitted about a 1% death rate. Even that small loss is not considered in debtor's projections. A significant disaster is not contemplated at all, but experience suggests that it is reasonable to expect one, especially over the 25 to 30 years of payments. There are no safeguards in the projection for such an event.

The last assumption is that Mony remains adequately protected in the transaction and over time. The Court pointed out earlier that the sale of the 585 acres is for less than appraised and probably less than market value. Mony debt equalled the value of the property at the time of the hearing. After the sale Mony has a security interest in 785 acres with improvements. A fair valuation of that property is $750,000 to $850,000. Thus the sale leaves Mony undersecured by as much as $170,000, using present debt and the lower valuation.

Those provisions of the Code allowing a debtor to impair a creditor and permitting valuation and deferred payments equalling present value, carried to their logical conclusion, would enable a Court to allow debtor to substitute collateral. Sections 1124, 506 and 1129 of the Code. Certainly the phrase "indubitable equivalent" carries the notion that collateral may be substituted for that which was bargained for. This substitution could be approved even though, as here, the creditor opposes the substitution. See In re Vestal, 82–03109–S–11 (unpublished Dec. 14, 1982, W.D.Mo.)

In re Vestal, however, is distinguishable. In Vestal all of the proceeds of sale were used to purchase cattle. The sale price of the land represented a fair market value and sellers retained no interest in the property. The creditor did make loans secured by cattle and would receive additional sums of money on a monthly basis reflecting the change in risk. The creditor had adequate protection. None of those factors are present here.

The Court holds, therefore, that the sale cannot be approved. This matter is set for hearing on the issue of whether Mony has a security interest in the Harvestores and whether the stay should be lifted as to the real estate. The hearing is set for Tuesday, March 6, 1984 at 1:30 P.M. in the United States Court House, 870 Boonville, Springfield, Missouri. The Court requests that counsel for the debtor address the following:

(1) The feasibility of reorganization on leased property.

(2) The use of the cattle in which Bank of Wheaton has a security interest.

(3) The parties are requested to brief, and file with the Court on or before March 2, 1984, the issue of Mony's security interest in the Harvestores.

The Court finds that Bank of Wheaton is adequately protected at this time. The Motion to Lift Stay or to Dismiss as to Bank of Wheaton is DENIED.