**In re Ernest G. WEYLAND and Diana Mae Weyland, Debtors.**

**Bankruptcy No. 86–00908.**

United States Bankruptcy Court, E.D. Wisconsin.

July 31, 1986.

---

**18.** Unlike lack of jurisdiction, of course, improper venue is a waivable defect.

Law Offices of Jeffrey P. White, S.C., Jeffrey P. White, Chicago, Ill., for debtors.

Michael, Best & Friedrich, K. Thor Lundgren, Milwaukee, Wis., and Paul S. Medved, for M & I Western State Bank.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

This case presents a novel question: should the court authorize the entry by Ernest G. Weyland and Diana Mae Weyland ("debtors") into the federally enacted Dairy Termination Program ("Program")? This Program became effective pursuant to The Food Security Act of 1985 (P.L. 99–198), which was enacted on December 23, 1985.

The debtors submitted their application for entry into the Program on March 7, 1986. This was the very last date for them to do so. Immediately after the application was submitted, the debtors filed their joint Chapter 11 petition, also on March 7, 1986.

Opposing the debtors' entry into this Program is M & I Western State Bank ("Bank"), a secured creditor. The Bank holds a security interest by virtue of a Farm Security Agreement dated April 13, 1984 containing the following description of collateral:

"All farm equipment now owned or hereafter acquired by debtor—

All livestock now owned or hereafter acquired by debtor, and the young of all livestock

The following products of livestock now owned or hereafter acquired by debtor: milk and milk proceeds."

The security agreement did not include "general intangibles." It also specifically excluded "all accounts and contract rights."[1]

The Bank also holds a second mortgage on the real estate owned by the debtors consisting of a dairy farm with approximately 117 acres. The real estate is subject to a first mortgage held by Federal Land Bank. As of the date of the filing of the debtors' Chapter 11 petition on March 7, 1986, the Bank had an unpaid balance due from the debtors on principal of $224,862.08 together with accrued interest of $1,349.08, for a combined total of $226,211.16.

The underlying collateral was appraised by Richard Freund for the Bank on April 22, 1986. The collateral was also appraised by Donald Wagner for the debtors on April 8, 1986. Both appraisers are well known to this court and are recognized as being very competent. Based upon their appraisals, the collateral shows the following values:

| TYPE OF COLLATERAL | | VALUE |
|---|---|---|
| Livestock | (Freund appraisal) | $57,855 |
| | (Wagner appraisal) | $78,070 |
| Farm Equipment | (Freund appraisal) | $70,800 |
| | (Wagner appraisal) | $52,855 |
| Additional farm equipment[2] (consisting of two Harvestore silos, one corn unit and miscellaneous barn and milking equipment) | (Freund appraisal) | $31,000 |
| | (Wagner appraisal) | $20,000 |
| Second mortgage in real estate | | No Equity[3] |

1. Within the farm security agreement is a category of collateral entitled "All accounts and contract rights now owned or hereafter acquired by debtor arising from the sale, lease or other disposition of the following farm products —." This category has a box before it which could have been checked by the Bank and thereby included as part of the Bank's collateral, as was done for the farm equipment, livestock and products of livestock. However, the box was not checked.

2. This additional farm equipment is also subject to a security interest held by Federal Land Bank. As of the present date, the priorities in this farm equipment as between M & I Western State Bank and Federal Land Bank are undetermined.

3. The real estate (after adjustments on the Freund and Wagner appraisals to make them comparable by including the mobile home and

If the higher of the two appraisals in each category of collateral is adopted, the maximum value of the Bank's collateral is approximately $180,000. The Bank's obligation is therefore only partially secured.

The Bank asserts that under its security agreement, it holds a paramount security interest in and is entitled to all payments which the debtor would receive under the Program if entry into the Program is approved by this court. The Bank further states that unless it obtains a favorable ruling that the Bank's security interest attaches to these payments, it objects to the debtors' entry into the Program and asks the court to disapprove the debtors' participation in the Program until after a confirmed plan of reorganization has taken place.

The creditors' committee, on the other hand, supports the debtors' entry into the Program and asserts that it is the debtors' only realistic hope of being able to reorganize.

In order to fully comprehend this matter, an understanding of the mechanics of the Program is fundamental. What is involved is a governmental program in which the Commodity Credit Corporation, on behalf of the government, is authorized to enter into contracts with milk producers. The Program seeks to reduce the quantity of milk marketed for commercial use and thereby help stabilize milk prices. Once a milk producer is accepted into the Program, that milk producer must either slaughter or export his entire herd of dairy cattle by the end of the contract disposal period. In this particular case, the contract disposal period will end on August 31, 1986. The milk producer, in addition to disposing of his entire herd, must neither acquire any interest in dairy cattle nor use any "pro-

duction facilities" for milk production for five years. Should the milk producer default under the contract, all payments he received must be returned together with interest. The milk producer also faces the potential of substantial penalties. Any milk producer desirous of participating in the Program was required to submit an application on or before March 7, 1986. As previously noted, the debtors have met this deadline.

The milk producer's application or "bid" under the Program was required to be based upon a "dollar per hundredweight of milk produced," which, in turn, is multiplied by the "contract base." The contract base is the applicant's total milk production during the lower of the following two milk periods: July 1, 1984 through June 30, 1985 or January 1, 1985 through December 31, 1985. This calculation would determine the total payment to be received by the milk producer, should the bid be accepted.

In the instant case, the debtors' bid was $20 per hundredweight of milk to be disposed of during the period April 1, 1986 through August 31, 1986, and the contract base totalled 1,271,836 pounds. By multiplying these two figures, the total payment under the Program contract would be $254,367.

The total herd composition of the debtors as contained in their bid consisted of 108 milking cows, 44 heifers and 25 calves. Of this herd, 20 milking cows belong to Kenneth Romberg. Although Romberg is not a debtor in this Chapter 11 case, he did join with the debtors in submitting the bid because his herd and the debtors' herd are intermingled and are all part of the same dairy operation. The debtors and Romberg have agreed among themselves that if their bid was accepted, $227,868 of the total pay-

excluding the so-called "additional farm equipment" consisting of two silos, one corn unit and miscellaneous barn and milking equipment) was appraised by Freund at $134,750 and by Wagner at $139,200. Because of the first mort-

gage held by Federal Land Bank with an unpaid balance due on the first mortgage of $204,659.40 as of the date of filing of the Chapter 11 case, there is clearly no equity for the Bank in the real estate.

ment would be allocated to the debtors and $26,499 to Romberg.

Under the Program, a milk producer has a choice of payment options. In this case, the debtors and Romberg have chosen to receive 32% in the first year ($81,397.50) and 17% in each of the following four years ($43,242.43 per year).

The debtors were notified on March 31, 1986 that their bid was accepted, subject to approval by the Bankruptcy Court.

The debtors have offered to pay to the Bank, as adequate protection, the fair market value of the dairy herd as of the date of the filing of the Chapter 11 case on March 7, 1986. They have further proposed using the higher of the two appraisals in arriving at the fair market value. In this case, the higher of the appraisals is the Wagner appraisal of $78,070. The debtors have also agreed to remit payment to the Bank from the slaughter price for the dairy herd and to make up the deficiency from the initial dairy termination payment.

## DOES THE BANK'S SECURITY INTEREST EXTEND TO THE DAIRY TERMINATION PROGRAM PAYMENTS?

■ The Bank contends it is entitled to receive all of the Program payments up to the balance due on the obligation from the debtors.

*Matter of Schmaling,* 783 F.2d 680 (7th Cir.1986) has established the law on this issue in this Circuit. It requires this court to conclude that the Bank's security interest does not extend to the contemplated Program payments. Although *Schmaling* involved another form of government program payments consisting of payment-in-kind (PIK) entitlements, its underlying rationale applies. Under the PIK program, a farmer receives surplus crop in exchange for an agreement by him not to plant his intended crop. *Schmaling* held that the corn received by the farmer under the PIK program did not fall within the definition of

"proceeds" (which was covered under the particular security agreement involved) but constituted "general intangibles" (which was not covered under that security agreement).[4] As a result, the corn could not be claimed by the secured creditor as part of its collateral.

The Bank argues that *Schmaling* is distinguishable because of a "marked difference between payments received from the disposition of collateral and government subsidies where no collateral is in existence." This is a distinction without significance because the debtors have agreed to pay the Bank not merely what it would actually receive as slaughter price when the cattle are disposed of, but, rather, the fair market value, which will be higher. The fact that a PIK program involves "in kind" benefits, as contrasted with cash under the Program, is also a meaningless difference. *In re J. Catton Farms v. First Nat. Bank of Chicago,* 779 F.2d 1242, 1245 (7th Cir.1985), states:

"It would make no difference whether the contract called for payment in cash or contemplated a barter of crops for crops; indeed, the latter would be an even clearer case of substituted collateral."

This court reads *Schmaling* as a clear rejection of the Bank's argument that all payments the debtors would receive under the Program are covered by its security agreement. *Schmaling* asserts that a security interest is limited strictly to the property or collateral described in the agreement. This principle was recently reiterated in *Matter of Martin Grinding and Machine Works,* 793 F.2d 592, 595 (7th Cir. 1986) where the court stated:

"A security interest attaches only to property described in the security agreement."

Whether an agreement creates a lien depends upon state law. *Butner v. United States,* 440 U.S. 48, 54–57, 99 S.Ct. 914, 917–19, 59 L.Ed.2d 136 (1979). In the case

---

**4.** The Bank cites *In re Hollie,* 42 B.R. 111 (Bankr.M.D.Ga.1984), for its holding that milk diversion program payments are a substitute for milk and milk proceeds, a position which was rejected by *Schmaling.*

before this court, it is Wisconsin law which determines the scope of the Bank's security interest and whether it extends to the proposed Program payments. § 409.106 of the Wisconsin Statutes (definition of general intangibles) is applicable. It reads in part:

> " 'General intangibles' means any personal property (including things in action) other than goods, accounts, chattel paper documents, instruments and money."

There are decisions from other jurisdictions which involve State Uniform Commercial Code statutes similar to Wisconsin's which hold that PIK agreements are "contract rights"[5] or "general intangibles" within the meaning of applicable state law. *See, In re Sunberg*, 35 B.R. 777 (Bankr.S.D. Iowa, 1983) (aff'd 729 F.2d 561 [8th Cir. 1984]); *In re Schmidt*, 38 B.R. 380 (Bankr. D.N.D.1984); *In re Mattick*, 45 B.R. 615 (Bankr.D.Minn.1985). It is not a major extension to hold, as this court now does, that other types of government agreements (including the Dairy Termination Program agreement before this court) are also "general intangibles." If the Bank had included within its security agreement "contract rights," "general intangibles," "government entitlements," or similar language, a different result might have been obtained. In this case, however, the security agreement did not contain such language, and the Bank cannot claim that the Program payments are part of its collateral.

The Bank of course takes the position that it is entitled to these payments because it knows that it is only partially secured. While inclusion of the Program payments as part of the Bank's collateral would markedly improve its position, this result would be correspondingly detrimental to the interests of the other unsecured creditors and such a result was never contemplated by the drafters of this Program. The Program was intended to benefit milk producers while at the same time not to impact adversely upon the interests of secured creditors whose security interests are duly perfected. The result urged by the Bank would provide it with a windfall in the form of new collateral never bargained for.

■ While a secured party is entitled to adequate protection, "the purpose of adequate protection under section 363(e) is to ensure that the secured creditor receives in value essentially what he bargained for." H.R. No. 595, Cong., 1st Sess. 338–39 (1977). U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6294–95. *See also, In re Briggs Transportation Co.*, 780 F.2d 1339 (8th Cir.1985); *In re Ahlers*, 794 F.2d 388 (8th Cir.1986). A court is not obligated to protect a creditor better than the creditor protected itself when making the loan and obtaining security. *In re Stein*, 9 B.C.D. 568, 19 B.R. 458 (Bankr.E.D.Pa.1982).

■ *Schmaling* pointed out that secured creditors can easily avoid the omission of collateral through careful drafting. If the security agreement was intended to secure government entitlements including PIK contracts or other governmental programs, it should have so provided through appropriate language. See, for example, *J. Catton Farms v. First Nat. Bank of Chicago, supra.* In the case at bar, the underlying security agreement and related documents were prepared by the Bank. It is a cardinal principle of construction that where there is any doubt as to the meaning of a document, it shall be construed against the drafting party. *In re Delafield Development*, 54 B.R. 442 (Bankr.E.D.Wis.1985); *In re Seifert Manufacturing Co., Inc.*, 83-04882 (Bankr.E.D.Wis.1985). Applying this rule requires a holding that the Bank's security agreement did not include rights to the Program payments.

Because of the court's ruling on the scope of the Bank's security interest, it is not necessary to decide whether the Bank perfected its interest by the filing of a financing statement in the proper place or

---

**5.** In 1973, all reference to "contract rights" under the Wisconsin Commercial Code provisions was repealed by Wis.L.1973, c. 215, § 20. However, "general intangibles" continue to be recognized in the Wisconsin Commercial Code.

places (the financing statement was filed with the Register of Deeds for Winnebago County, Wisconsin, but not in the office of the Secretary of State of Wisconsin), or to address the alternative argument raised by the debtors that the contract involved is a "post-petition contract" not subject to any pre-petition lien by virtue of § 552 of the Bankruptcy Code.

## CAN THE COURT AUTHORIZE THE DEBTORS' PARTICIPATION IN THE DAIRY TERMINATION PROGRAM OVER THE BANK'S OBJECTION?

The Bank next asserts that it will not consent to the sale of the dairy herd and that there can be no sale without its consent. This contention brings § 363(f) of the Bankruptcy Code into focus. § 363(f) permits the sale of the collateral free and clear of the interests of a secured creditor only upon satisfaction of any of the following conditions:

1.  If applicable nonbankruptcy law permits such sale free and clear of such interest.
2.  Upon consent of the entity holding an interest in the property.
3.  If the interest is a lien and if the price at which the property is being sold is greater than the aggregate value of all liens on the property.
4.  If such interest is in bona fide dispute.
5.  If the entity holding the security interest can be compelled to accept a money satisfaction of its interest in a legal or equitable proceeding.

In view of the Bank's refusal to consent to the sale, the second condition set forth above is absent. In this case, it is also clear that the first and fourth conditions cannot be satisfied.

■ A forceful argument can be made that the third condition contained in § 363(f)(3) can be satisfied to permit a sale free and clear of the Bank's lien. This argument is based upon the premise that the "true" price at which the collateral is being sold is greater than the value of the

Bank's lien (which is the only lien on the dairy herd), after taking into account: (1) the debtors' commitment to pay to the Bank the slaughter price for the dairy herd and the difference between the slaughter price (which is less than the value of the Bank's lien) and the fair market value of the dairy herd, and (2) the anticipated costs of sale which the Bank would otherwise incur if it would be required to liquidate its collateral. All of this would require something more than a literal reading of § 363(f)(3). In any event, the court believes that § 363(f)(5) provides authority for a sale free and clear of the Bank's interest, notwithstanding its refusal to consent. A sale, based upon the authority contained in § 363(f)(5), requires, in turn, a showing, pursuant to § 363(e) of adequate protection to the secured creditor. House Report No. 95–595, 95th Cong., 1st Sess. 345 (1977). See Senate Report No. 95–989, 95th Cong., 2d.Sess. 56 (1978). The very heart of adequate protection is to assure the secured creditor that as bankruptcy procedures unfold in a case, the secured creditor will not be faced with a decrease in the value of its collateral. *In re Born*, 10 B.R. 43 (Bankr.S.D.Texas 1981); *In re Beker Industries Corp.*, 58 B.R. 725, 736 (Bankr.S.D.N.Y.1986).

In the light of the existing facts and circumstances, this court is satisfied that all of the criteria needed to compel the Bank to accept a money satisfaction of its lien are present in this case. Legal precedent exists for this conclusion. *See, In re Hunt Energy Co., Inc.*, 48 B.R. 472 (Bankr. N.D.Ohio E.D.1985); *In re Red Oak Farms, Inc.*, 36 B.R. 856 (Bankr.W.D.Mo.S. D.1984); and *Matter of Stroud Wholesale, Inc.*, 47 B.R. 999 (E.D.N.C.1985).

■ In *Hunt Energy, supra*, the court held that a secured creditor can be required to accept a money satisfaction of its interest within the context of a cramdown under § 1129(b)(2)(A) provided the creditor has received the "indubitable equivalent" of its claim up to the value of its collateral. The test of whether a creditor's cash collateral is being adequately protected is not wheth-

er that creditor's claim is fully secured. Rather, the test is whether the debtor has provided a method of alternatively giving creditors the value of their cash collateral. *In re Johnson,* 47 B.R. 204 (Bank.W.D.Wis. 1985).

■■■■ The value of the property on the date that the petition is filed determines the amount of the claim entitled to adequate protection. *In re Johnson, supra.* Here, the Freund and Wagner appraisals of the dairy herd were obtained less than two months after the filing of the Chapter 11 case. They are therefore reliable for establishing values for adequate protection purposes to establish valuation. Since the debtors have agreed to pay to the Bank the fair market value of the dairy herd by using the higher of the two appraisals and also to pay this sum through a combination of the proceeds from the slaughter price and from the first payment under the Program, the Bank will be receiving the "indubitable equivalent" of its claim.

In *Red Oak Farms, supra,* similar reasoning was employed in reaching the conclusion that a plan can be "crammed down" on a creditor through a combination of a lien being retained by that creditor and deferred payments being remitted equal to the present value of the creditor's collateral. Under the particular facts involved in *Red Oak Farms, Inc.,* the court held that § 363(f)(5) could not be invoked because of the substantial risk of payment not being received by the creditor (in that case, payments were to be remitted over a period of 25–30 years). That risk does not exist here. The Bank will be fully paid within one year from the date of the disposal of the herd. The source of the payments to be received is a reliable payor—the United States government.

In *Stroud Wholesale, supra,* the court interpreted "money satisfaction" within the meaning of § 363(f)(5) as not requiring a full monetary satisfaction of the debtor's lien in Chapter 11 cases. The court recognized that "equitable considerations" must be taken into account in these reorganization cases which under appropriate circumstances could warrant creditors receiving less than full satisfaction of their interests provided those interests are secured by other collateral.

The ultimate goal of a Chapter 11 reorganization, as contrasted with a liquidation, is the formulation and confirmation of a plan to permit a business or individual to restructure a debtor's debts and continue in operation for the benefit of its creditors and the economy in general. The debtors have testified in this case that they intend to remain in a farming operation, but on a reduced scale. They plan on keeping a much smaller amount of acreage, engaging in a cash cropping operation on owned and leased land and submitting a plan for payment to creditors to be funded through a combination of payments under the Program and their future earnings.

Application of § 363(f)(5) to the fact situation in this case makes sense and will not prejudice the Bank. The alternative of not invoking § 363 to authorize a sale, and thereby disallowing the debtors' participation in the Program, would produce disastrous results not only for the debtors but for their other creditors. Such results would be contrary to the objectives of both the Dairy Termination Program and the Bankruptcy Code.

CAN THE COURT AUTHORIZE DEBTORS' ENTRY INTO THE PROGRAM BY USE OF § 363(b) AND PRIOR TO A CONFIRMED PLAN OF REORGANIZATION?

■■■ The Bank contends that authorizing entry into the Program under § 363(b) of the Bankruptcy Code would "short circuit" the confirmation process under Chapter 11 and undermine the Code's intent to provide creditors with an opportunity to vote on or object to a plan of reorganization. In effect, the Bank is asking the court to require the debtors to (1) file a disclosure statement and proposed plan, (2) obtain court approval of the disclosure statement, (3) submit ballots to the creditors so that they can vote on the plan, and (4) obtain an order of confirmation, before approving the debtors' participation in the Program. In

support of this position, the Bank cites *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983), *In re Lionel Corporation*, 722 F.2d 1063 (2d Cir.1983), and *In re Continental Airlines*, 780 F.2d 1223 (5th Cir. 1986).

A close reading of *Braniff, Lionel* and *Continental* leads to the conclusion that the use of § 363(b) in this case would not be inconsistent with those decisions. All of these decisions are distinguishable because the disposition of the dairy herd does not involve a sale of all or substantially all of the debtors' assets. This is not a situation where there will be nothing left to reorganize. The debtors will still retain a substantial portion of their assets to enable them to remain in the farming business, albeit on a reduced basis. The proposed disposition is not a maneuver intended to deprive the creditors of protection they would otherwise be receiving at the plan confirmation stage. In any event, *Braniff* does not hold that § 363(b) prevents the sale of all or substantially all of the debtor's assets (*see, In re Braniff Airways, Inc., supra,* 700 F.2d at 939):

> "The appellants contend that § 363(b) is not applicable to sales or other dispositions of all the assets of a debtor, and that such a transaction must be effected pursuant to the voting, disclosure and confirmation requirements of the Code.
>
> —
>
> We need not express an opinion on this controversy—"

What *Braniff* holds is that § 363(b) does not permit the sale of assets which restructure the rights of creditors and dictates the terms of any future reorganization plan.

■ Furthermore, *Braniff* recognizes the "emergency standard" which under appropriate conditions permits sales before confirmation. Clearly, an emergency situation exists here. In order to comply with the Program, the debtors must dispose of their entire dairy herd by August 31, 1986. The timing of the Program does not permit the use of the detailed and time-consuming procedures urged by the Bank. Following these steps would not merely reduce the debtors' ability to succeed in a reorganization. It would eliminate the debtors' ability to comply with the Program and destroy any chance they might otherwise have to reorganize. A bankruptcy court is not bound to rigidly adhere to procedural formalities and ignore the underlying equities. *In re Interstate Restaurant Systems, Inc.,* 61 B.R. 945 (S.D.Fla.1986).

*Lionel*, which arose after *Braniff,* expanded upon the use of § 363(b) beyond the emergency standard and adopted the "business justification" test. In *Lionel,* the court recognized that there must be "some play for the operation of § 363(b)" and asserted, 722 F.2d 1063 at 1069:

> "To further the purposes of Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances. This is exactly the result a liberal reading of section 363(b) will achieve."

*See also, Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir.1986) which follows the reasoning of *In re Lionel Corporation* by holding that a bankruptcy court can authorize a sale of all of the Chapter 11 debtor's assets under § 363(b) when a sound business purpose dictates such action.

■ *In re Continental Airlines, Inc.* is the most recent of the decisions cited by the Bank. It affirmed the principle asserted in *Braniff* that a debtor may not use § 363(b) "to sidestep the protection creditors have when it comes time to confirm a plan of reorganization" (780 F.2d at 1227). However, it also states, 780 F.2d at 1228:

> "—We fully appreciate that post-petition, pre-confirmation transactions outside the ordinary course of business may be required and that each hearing on a section 363(b) transaction cannot become a mini-hearing on plan confirmation. Balancing these considerations, we hold that when an objector to a proposed transaction under section 363(b) claims that it is being denied certain protection because approval is sought pursuant to section 363(b) instead of as part of a reorganization plan, the objector must specify exactly

what protection is being denied. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan."

If it appears that creditors will actually be prejudiced by adhering to the procedural requirements including plan confirmation, then the safeguards should yield to common sense and expediency. Hurley, *Chapter 11 Alternative: Section 363 Sale of All of the Debtor's Assets Outside a Plan of Reorganization,* 58 Am.Bankr.L.J. 233, 249 (1984).

The Bank has expressed concern as to possible dissipation by the debtors of the Program payments before a confirmed plan is obtained. The court, however, can and will fashion an order to alleviate that anxiety by requiring that all payments be placed in an escrow account, subject to further court order.

## DO THE PAYMENTS UNDER THE DAIRY TERMINATION PROGRAM CONSTITUTE PROPERTY OF THE ESTATE?

The court rejects the debtors' contention that their right to these payments is not property of the estate.

In support of their argument, the debtors submit that: (1) the payments are "earnings from services performed by an individual debtor after the commencement of the case" within the meaning of the exception under § 541(a)(6), (2) the payments are only conditional because they are capable of being refunded in the event of a default by the debtors under the Program, and (3) as of the date of the filing of this Chapter 11 case, the debtors had only submitted a bid which had not as yet been accepted and therefore they had no ownership interest in the future payments.

*U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), proclaimed that § 541(a) must be read broadly in determining what constitutes property of the estate. *Whiting Pools, Inc.,* 462 U.S. at 204, 103 S.Ct. at 2313 states:

"Both the Congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate."

■ This expansive definition of property under § 541 covers all legal or equitable interests in property of the debtor unless specifically excluded by the statute. The court does not read "earnings from services performed by an individual debtor after the commencement of the case" to include payments for services *not* performed by the debtor. In *In re Fitzsimmons,* 725 F.2d 1208, 1211 (9th Cir.1984), the court states:

"We hold that the earnings exception applies only to services performed personally by an individual debtor, because giving the exception the broader scope that [the debtor] urges would seriously interfere with continued operation of a sole proprietorship during the course of a Chapter 11 case."

■ The debtors' second argument as to the conditional nature of the payments under the Program is also rejected. *In re Lee,* 35 B.R. 663 (Bankr.N.D.Ohio 1983), which dealt with a PIK program, involved a similar argument. The debtor claimed that because of his duties to forego planting and maintain a soil conserving crop under the governmental program which was involved, the payments he would be receiving were subject to "conditions precedent" and, accordingly, not property of the estate. The *Lee* court concluded that these requirements did not constitute "conditions precedent" and that what existed was nothing more than a "simple contract with benefits and obligations flowing to both sides." The court in *Lee* held that the rights of the debtor under the contract constituted property of the estate within the meaning of § 541(a). This court agrees with that analysis.

■ The debtors' final argument—that because the bid had not as yet been accepted when the Chapter 11 case was filed,

there was not any property interest—is also rejected. Had an accepted bid been in effect before the Chapter 11 case was filed, the payments under the contract would clearly have constituted property of the estate under § 541(a)(1). By the same token, if the debtors had filed their Chapter 11 case and thereafter submitted a bid which was subsequently accepted, under § 541(a)(7), the debtors' rights to Program payments would also have constituted property of the estate as an "interest in property that the estate acquires after the commencement of the case." To permit the debtors to submit a bid, immediately thereafter file their Chapter 11 case and obtain a ruling that the payments were not property of the estate, would produce an anomalous result. It would also foster an unconscionable opportunity to manipulate the Bankruptcy Code. In *In re Segal v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966), the test applied by the U.S. Supreme Court in determining what constituted property of the estate was whether the nature of the property interest was "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start." Applying that test to this case, the court is satisfied that the particular property interest involved is sufficiently rooted in the debtor's pre-bankruptcy past and that inclusion of the Program payments as property of the estate will not impair their ability to make an unencumbered fresh start, particularly where the debtors have proclaimed their intent to use these payments as a source for funding their plan.

### SUMMARY

Based upon the foregoing, the debtors' entry into the Dairy Termination Program in accordance with the terms and conditions of their March 7, 1986 bid is authorized. All proceeds which shall be received by the debtors under this Program (including that portion which the debtors and Romberg have agreed would be allocated to Romberg) shall be placed in escrow in an interest-bearing account and shall not be disbursed without further order of this court.

This decision shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.