**In re David COLLINS and Beverly Collins, Debtors.**

No. BKY 4–86–2702.

United States Bankruptcy Court, D. Minnesota.

Dec. 9, 1986.

Carrie A. Hefte, and James H. Levy of Oppenheimer, Wolff & Donnelly, Minneapolis, Minn., for The First National Bank of Osakis.

Wendy Alison Nora, Minneapolis, Minn., for debtors.

## ORDER

MARGARET A. MAHONEY, Bankruptcy Judge.

The above entitled matter came on for hearing before me on the motion of The First National Bank of Osakis (Bank) for dismissal of the debtors' chapter 13 case. This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157(b)(1) and Local Rule 103(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O). The Bank alleges that the debtors are not debtors qualified for chapter 13 under 11 U.S.C. § 109(e) and that debtors' plan violates 11 U.S.C. § 1322(c).

The debtors are farmers. In fact, Mr. Collins has been a farmer since 1953. Prior to filing their bankruptcy case, debtors submitted a bid to the Commodity Credit Corporation (CCC) to terminate their dairy farming operation for a certain price and their bid was accepted. The Dairy Termination Program seeks to reduce the quantity of milk being marketed nationwide and thereby to stabilize milk prices. If a milk producer's bid was accepted, the producer had to sell or slaughter his dairy herd within a certain period and had to agree to forego any interest in a dairy operation for five years. Debtors' proposed chapter 13 plan would apparently use their dairy termination program payments to fund their chapter 13 plan and to pay creditors including the Bank.

The parties stipulated to certain facts which establish that the Bank has a perfected security interest in the livestock, proceeds of livestock and general intangibles of the debtors. This security interest was established pursuant to a promissory note originally given to the Bank on March 31, 1983 by the debtors and additional promissory notes as of May 26, 1983 and May 31, 1984. The Bank claims a security interest in the livestock sale proceeds and the dairy termination program payments 1) as farm products and products or produce thereof, 2) as general intangibles, and 3) as a substitution and replacement for and product of farm products and/or general intangibles.[1] The total amount due and

---

1. The Security Agreement of the Bank gives it a     security interest in:

owing to the Bank as of the date of the filing of the bankruptcy petition (September 11, 1986) was $138,732.37.

The debtors sold their livestock for $20,041.24 pursuant to the Dairy Termination Program requirements. The debtors and Bank have agreed that these proceeds represent proceeds of debtors' livestock and are subject to the Bank security interest.

The debtors also have received the sum of $60,240.74 as a result of their participation in the dairy termination program to date. This sum is presently on deposit with the Viking Savings Association. The debtors will receive from the Commodity Credit Corporation an additional $46,444.00 over the next four years in equal annual installments of $11,500.99 as a result of their participation in the dairy termination program. The $106,684.74 represents payments made to the debtors for not producing milk.

Mr. Collins testified that he would be unemployed as of the end of harvest season and planned to go to school over the next five years. The debtors' petition lists yearly income of $7,356.00 [2] and monthly expenses of $821.00. The debtors' yearly income is not sufficient to meet expenses.

■ The Bank argues that the Collins' are not qualified chapter 13 debtors under 11 U.S.C. § 109(e) because they are not "an individual with regular income". The debtors took the position that the $11,500.99 per year to be paid to them from the dairy termination program constituted regular income, together with their other yearly income of $7,356 noted on their petition.

Whether the dairy termination program payments are subject to the Bank's security interest is crucial to debtors' ability to make chapter 13 plan payments. Case law

within Minnesota and in other states is in conflict as to whether government program payments for non-production are "products, produce or proceeds of livestock." *In re Grunzke*, 68 B.R. 446 (Bktcy.D.Minn. 1986) (holding that Dairy Termination Program payments are not subject to a prepetition lien in livestock proceeds); *Bechtold v. Miller (In re Bechtold)*, 54 B.R. 318 (Bktcy.D.Minn.1985) (Dairy Diversion Program payments are not subject to a prepetition lien in products of livestock or produce of livestock); *In re Weyland*, 63 B.R. 854 (Bktcy.E.D.Wis.1986) (Dairy Termination Program payments are not proceeds or produce); *Production Credit Association of Fairmont v. Martin County National Bank*, 384 N.W.2d 529 (Minn.App.1986) (PIK payments are proceeds of crops); *In re Kruse*, 35 B.R. 958 (Bktcy.D.Kansas 1983) (PIK payments are crop proceeds); *Pombo v. Ulrich (In re Munger)*, 495 F.2d 511 (9th Cir.1974) (Crop abandonment payments are crop proceeds). However, in deciding this case, I do not feel I need to reach the issues raised by consideration of whether dairy termination program payments are products or proceeds of livestock. In this case, the Bank also had a security interest in general intangibles of the debtors. This language covers Dairy Termination Program payments.

The Eighth Circuit ruled that a security interest in proceeds of collateral, contract rights, accounts and general intangibles covered payment in kind (PIK) benefits. *In re Sunberg*, 729 F.2d 561 (8th Cir.1984). I see no reason to distinguish the dairy termination program payments from the PIK payments. The payment in kind program "pays" a farmer surplus crops in exchange for the farmer not growing crops on his own land. These rights to payment

---

... All farm products of Debtor, whether now owned or hereafter acquired, including but not limited to 1) all ... livestock and their young, products thereof and produce thereof

\* \* \* \* \* \*

... All general intangibles of Debtor, whether now owned or hereafter acquired, including, but not limited to, applications for patents, patents, copyrights, trademarks, trade secrets,

good will, tradenames, customer lists, permits and franchises, and the right to use Debtor's name.

together with all substitutions and replacements for and products of any of the foregoing property....

**2.** The $7,356 yearly income is from a land retirement program.

are general intangibles. In this case, the situation is the same. The dairy farmer is paid to terminate his dairy operation for at least five years. A dairy termination payment is a general intangible. The distinction between a right to payment in commodities or payment in cash is not important to this issue.

11 U.S.C. § 552 prevents prepetition security agreements from attaching to post-petition property or proceeds. This section does not apply here as the Dairy Termination Program monies owed to the debtors were determined and owed before the bankruptcy. The right to payment from the Commodity Credit Corporation predated the bankruptcy and thus was an asset of the estate under 11 U.S.C. § 541. *In re Sunberg, supra.*

This case is distinguishable from the *Grunzke* case cited above. The *Grunzke* decision held that a bank is not entitled to Dairy Termination Program benefits due to a security interest in a debtor's dairy herd under "proceeds" language in the security agreement. It did not reach the issue of whether a general intangibles security interest would cover such benefits. Also, the *Grunzke* case involved a bankruptcy filing which predated the debtors' acceptance into the Dairy Termination Program. The right to benefits was not certain at filing.

Unlike the *Sunberg* case, in this case the debtors and the Bank were probably not aware that a dairy termination program would be instituted at the time of the signing of the promissory notes. Therefore, the dairy termination program was not contemplated as a "general intangible" when the documents were signed. However, there were in existence in 1983 and thereafter various government programs, such as the PIK program, which paid farmers for not doing something. Therefore, it seems reasonable to assume that the parties understood that the general intangibles section of the security agreement could cover payments such as the one from the dairy termination program.

The debtors argue that language in paragraph 14 of an appendix to the contract to participate in the dairy termination program dictates that dairy termination program payments are not subject to existing collateral agreements. Paragraph 14B of the appendix states:

> Claims—Any payment which is due to any person shall be allowed without regard to questions of title under State law and without regard to any claim or lien against the unit or any milk produced from the unit, and the proceeds thereof, which may be asserted by any creditor except agencies of the United States Government.

This same language is contained in the PIK program agreements except for the words "except agencies of the United States Government". The language of the dairy termination program document and the PIK program document at paragraph 14B simply indicates that the federal government will not be responsible for determining ownership of PIK benefits or dairy termination program benefits. As stated in *In re Sunberg* at 729 F.2d 563 "such 'anti-assignment' provisions are intended to insulate the government as benefit provider from conflicting claims over payments, not to preempt state commercial laws between third parties." *In re Preisser,* 33 B.R. 65, 67 (Bktcy.D.Colo.1983).

■ The debtors have no income from the Dairy Termination Program payments. It is all collateral of the Bank. However, the debtors have established that they have regular income which qualifies them for chapter 13 status since they receive $7,356 per year from a land retirement program. Although it appears unlikely that the debtors can propose a confirmable plan with income insufficient to meet their monthly personal needs, the language of 11 U.S.C. § 109(e) is satisfied and debtors are qualified chapter 13 debtors.

The Bank also argues that debtors' plan as presently proposed does not meet the qualifications of 11 U.S.C. § 1322(c) which requires plan payments to end no later than three years after the commencement of the plan or no later than five years after the commencement of the plan with court

approval. Debtors' plan does require payments over a period of eight or more years. This also on its face makes the plan unconfirmable. However, this is a confirmation issue which is properly addressed at the confirmation hearing.

Since the debtors do qualify as chapter 13 debtors, this case should be set on for a confirmation hearing.

IT IS THEREFORE ORDERED that:

This case is set for a hearing on confirmation of debtors' plan on December 18, 1986 at 8:30 a.m., in Courtroom No. 2, 600 Galaxy Building, 330 Second Avenue South, Minneapolis, Minnesota.